James E. STURGESS, Jr., Richard Banks, Sr., and George E. Blake, Plaintiffs,

v.

Paul L. NEGLEY and Robert O. Clower, Individually and in their Official Capacities as Officials of the Town of Fenwick Island, and the Town of Fenwick Island, a municipality of the State of Delaware, Defendants.

Civ. A. No. 89–391–JRR.

United States District Court, D. Delaware.

April 24, 1991.

William D. Fletcher, Jr., and Crystal L. Reihm, Schmittinger & Rodriguez, P.A., Dover, Del., for plaintiffs.

Roger A. Akin, Sawyer & Akin, P.A., Wilmington, Del., for defendants.

## OPINION

ROTH, District Judge.

This action stems from an employment dispute in the Police Department of the Town of Fenwick Island, Delaware. Plaintiffs, James E. Sturgess, Jr. ("Sturgess"), Richard C. Banks, Sr. ("Banks"), and George E. Blake ("Blake"), filed this action alleging denial of procedural due process under the Fourteenth Amendment and 42 U.S.C. § 1983 (1988), and asserting pendent state tort claims. The defendants are Paul C. Negley ("Negley") and Robert O. Clower ("Clower"), both individually and in their official capacities, and the Town of Fenwick Island. Presently before this Court are Defendants' Motion to Dismiss, which has been converted into a motion for summary judgment, and Plaintiffs' Motion to Amend the Complaint. For the reasons that follow, defendants' summary judgment motion will be granted in part and denied in part. More specifically, we will grant summary judgment in favor of the Town of Fenwick Island, but will deny the motion as to the individual defendants. In addition, we will grant plaintiffs' motion to amend.

## FACTS

Plaintiffs are permanent part-time police officers in the Fenwick Island Police Department. At the time of the events at issue, Defendant Negley was President of the Town Council of Fenwick Island, and Defendant Clower was Commissioner of Public Safety of Fenwick Island and a member of the Council. This action arises out of an employment dispute between plaintiffs and defendants during the summer of 1989.

During that summer, Police Chief James L. Cartwright ("Cartwright") was injured, and was therefore unable to serve in his position for approximately six weeks. The Town Council of Fenwick Island appointed Officer Donna Hitchens ("Hitchens") to serve as Acting Chief of Police. Hitchens was at that time the only full-time woman on the police force, and she was chosen over another officer with greater seniority. Hitchens began her duties as Acting Chief on July 1, 1989. This was the eve of the Fourth of July weekend, during which the tourist population in Fenwick Island greatly increases.

The events at issue in the present case began on July 1, 1989, when Banks did not report for his scheduled shift. Hitchens called Banks' home and his wife informed Hitchens that Banks was ill and could not work. Banks' wife also told Hitchens either that she or that Banks himself had contacted Cartwright to report Banks' illness, and had left a message on the police tape recorder. In addition, Banks states that he reported his illness to Officer Davidson. Hitchens asserts that Banks should have known Cartwright was not serving as Chief of Police at the time, and further claims that there was no such taped message on the recorder. Then on July 2, 1989, neither Banks nor Blake appeared for their scheduled shifts. Blake asserts that he called Officer Davidson and telephoned Suscom, a county-wide police communication system, to report that he was unable to work due to a knee injury. Hitchens was not contacted. After discovering these absences on July 2nd, Hitchens called Negley, President of the Town Council, and told him "I think we have an insurrection on our hands." (Docket Item 16A at A–20).

On July 3, 1989, Sturgess did not report to work. Although his name appeared on the schedule, Sturgess had earlier written a memo to Cartwright, dated April 23, 1989, in which he requested time off for the first two weeks of July. (D.I. 19A at A–60). Cartwright later testified that the request had been approved. (D.I. 19A at A–22—A–23). Blake also failed to report to work on July 3rd. On July 4, 1989, Banks, Blake, and Sturgess were all listed as scheduled to work and none either appeared for duty or called in advance. Banks and Blake were also scheduled to work on July 8th, and again, neither reported for their shifts or called to report their absences.

During this time, Hitchens regularly communicated these absences to Negley and to Clower, the Commissioner of Public Safety. Defendants contend that Negley

and Clower determined this was a case of the "blue flu," or a series of more than coincidental, simultaneous claims of illness by public employees who are prohibited by law from striking. Hitchens, Negley, and Clower did not, however, contact any of the plaintiffs to ask them to explain their absences. Rather, they responded by sending letters to Banks, Blake, and Sturgess on July 8, 1989.

The letters (D.I. 16A at A–22, A–23, A–24) stated the shift each officer had missed, and informed each plaintiff that "Your failure to report as scheduled or to call in to request to be relieved of your shift has been determined to be a voluntary quit." They also requested that each officer return his uniforms, equipment and supplies. The letters were written on The Town of Fenwick Island letterhead, and were signed by Robert O. Clower as Commissioner of Public Safety and by Paul L. Negley as President of the Town Council. On July 11, 1989, Negley and Clower sent revised letters (D.I. 16A at A–27, A–28, A–29) which corrected the lists of missed shifts, and in the Banks letter, supplemented the list with a shift missed on July 8th, the date of the earlier letters.

Also on July 11, 1989, Sturgess, Banks, and Blake responded by writing letters addressed to Cartwright, Clower, and Council Member Villalon. Sturgess wrote:

Reference—Time off

I received a letter today from Commissioners Clower & Negley stating I had voluntarily quit. This came as a surprise because I had requested time off the first two weeks of July. It was not my intention to quit as police officer for Fenwick Island.

I am requesting a hearing before all Council Members as soon as possible.

I was expecting to return to work 7–16–89. Ready, willing and able to do so.

(D.I. 16A at A–30). Banks' and Blake's letters also stated that they had not quit voluntarily, and also requested hearings with the Town Council. Banks stated "I have been out on sick leave and have been under doctor's care for the past three weeks," (D.I. 16A at A–31), and Blake wrote "I have been sick and under the doctor's care." (D.I. 16A at A–32). In addition, at some point after they received their voluntary quit letters, Banks and Blake provided town officials with written medical excuses. Banks provided notices from Dr. Prentiss W. Adkins, Sr. stating that he was ill and unable to work. (D.I. 19A at A–57—A–58). Blake submitted a certificate from Dr. Borodulia stating that he had been under the doctor's care for inflammation of his left knee. (D.I. 19A at A–59).

Negley and Clower chose not to respond to plaintiffs' letters or to rescind their own letters. Three other Councilmen, however, namely Villalon, Garvey, and Babble, called a special meeting of the Council to review the situation. A public hearing was held on July 24, 1989, and the transcript of the testimony at the hearing has been reproduced in the appendix to plaintiffs' answering brief on the summary judgment motion. Following the hearing, the Council members voted to rescind the letters. Thereafter the plaintiffs were reinstated in their positions.

## DISCUSSION

### I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants filed a motion to dismiss the complaint on August 24, 1989. The parties subsequently agreed to conduct discovery prior to briefing the motion, and briefing was not completed until early in 1991. With their briefs, the parties have filed appendices including affidavits, portions of deposition testimony, and the transcript from the Town Council hearing. Thus, as the parties have recognized, pursuant to Fed.R.Civ.P. 12(b) the motion has been converted into a motion for summary judgment. Since the parties have conducted discovery, and, as Rule 12(b) requires, have had a "reasonable opportunity to present all material made pertinent" to a summary judgment motion, we shall treat defendants' motion as one for summary judgment under Rule 56.

In their motion, defendants raise four grounds for granting summary judgment in their favor. First, they assert that they did not commit any wrong acts in their treatment of plaintiffs, and therefore no liability can attach. Second, they claim that Defendants Negley and Clower are protected by qualified immunity. Third, they argue that the Town of Fenwick Island cannot be liable under 42 U.S.C. § 1983 (1988), because plaintiffs have not established the existence of an unconstitutional policy or custom. Finally, they contend that should this Court agree with the above arguments and grant summary judgment on the federal constitutional claims, the Court should then dismiss plaintiffs' pendent state claims.

Summary judgment may be granted under Rule 56(c) if the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Whether a fact is "material" is determined by the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In order for an issue to be a "genuine" one, there must be sufficient evidence for a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, all factual inferences must be drawn in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

### A. Defendants' Argument That They Committed No Wrong

Defendants first contend that all their actions were proper, and that consequently, they cannot be liable for any offense against plaintiffs. Essentially, they argue that they did not terminate plaintiffs by sending the "voluntary quit" letters, because plaintiffs had already terminated their employment relationships by failing to appear for work. They assert that plaintiffs breached their duties of faithful performance by failing to report for their as-signed shifts without providing proper notice to their superiors. As a result, they maintain that "Negley and Clower took a reasonable and necessary personnel position in determining that plaintiffs Sturgess, Blake and Banks had in fact constructively resigned." Defendant's Opening Brief at 18. They further state that defendants owed a fiduciary duty to the Town of Fenwick Island, and that the lack of police officers on duty posed a threat to the security of the town's residents and visitors. Thus, they conclude that defendants were required to clear the positions held by plaintiffs so that replacements could be hired.

Ordinance Number 54 of the Town of Fenwick Island (D.I. 16A at A–38—A–54) outlines the personnel management procedures for the town. All three plaintiffs occupy positions as regular permanent part-time employees under Section 2(B)(1). Section 8 of the ordinance relates to specific procedures for the Police Department. Section 8(2)(d) provides that "The Council reserves the right to dismiss a probationary or part-time policeman if it appears that he does not have the qualities which the Council feels are necessary to meet the needs of the Town." In addition, Section 8(6) requires a hearing in certain circumstances, including any time that an officer is "charged with a breach of discipline of any kind which could lead to any form of disciplinary action excluding reprimands." The procedures to be followed in conducting such a hearing are set forth in Sections 8(7)–(10).

Defendants contend that it was "not necessary" for them to follow the procedures outlined in Ordinance No. 54, because plaintiffs had already terminated their employment relationships with the town. They maintain that Negley and Clower had the authority to construe plaintiffs' absences as constructive resignations, and that consequently, no action of the Town Council was needed.

■ To the extent that defendants argue that they had the authority to construe plaintiffs' acts as "constructive resigna-

tions" even if they knew that plaintiffs did not actually intend to resign, we find that this argument is one of mere semantics. Essentially this boils down to a contention that defendants had the authority to terminate plaintiffs for unauthorized absences. It is clear from Ordinance No. 54, however, that only the Town Council has such authority, and that a hearing is required before the Council may act. Moreover, this Court has previously rejected the argument of a town which treated an employee's "alleged unexcused absences as an implicit resignation," and held that "[a] public employer cannot circumvent its constitutional obligations by recharacterizing an employee's termination as a resignation." *Meding v. Hurd*, 607 F.Supp. 1088, 1108 (D.Del. 1985).

We need not determine whether defendants are correct in their assertion that if plaintiffs had indeed voluntarily quit their positions, then defendants were not required to follow the procedures of Ordinance No. 54. We find that plaintiffs have at least raised genuine issues of material fact as to whether they had truly quit or whether they were actually terminated. Plaintiffs have documented the reasons for their absences, and Sturgess even presented a memo requesting the time off in advance. Moreover, when viewed in the light most favorable to plaintiffs, the record supports a finding that Negley and Clower actually thought plaintiffs' behavior constituted insubordination and a refusal to recognize the authority of Acting Chief Hitchens, and that they did not in fact believe that plaintiffs had voluntarily quit.

For example, Negley testified at his deposition that when Hitchens called him and stated "I think we have an insurrection on our hands," Negley agreed with this characterization. (D.I. 16A at A–20—A–21). Also at Negley's deposition, he was asked "Isn't it fair to say that ... you thought it was an insurrection, people were just refusing to come to work.... [W]asn't that just out and out insubordination and you weren't going to put up with that?" Negley responded "I guess it could be summarized that way." (D.I. 19A at A–90). In fact, throughout defendants' briefs, they characterize plaintiffs' acts as a case of the blue flu, and not as actual voluntary resignations. While unauthorized absences, insubordination, or the blue flu may provide strong grounds for termination, they are not equivalent to voluntary resignations from a job.

Moreover, even if plaintiffs did indeed breach their employment contracts, this would not warrant summary judgment for defendants on a claim for procedural due process. Plaintiffs' complaint does not assert a claim for breach of their employment contracts, and the fact that an employee may deserve to be fired because he or she failed to perform certain assigned duties does not mean that due process may be circumvented. In arguing that their actions were justified, defendants contend that Negley and Clower needed to act quickly because the police officers' absences occurred during the very busy Fourth of July weekend. They also strongly hint that plaintiffs' actions stemmed from their refusal to recognize the authority of a female Acting Chief of Police. Yet, defendants did not act until July 8th, when the weekend had already ended. More importantly, however reprehensible plaintiffs' conduct may have been, so long as plaintiffs did not voluntarily resign, they are entitled to procedural due process before being terminated.

 Under the Due Process Clause of the Fourteenth Amendment, if plaintiffs possess property rights or liberty interests in their continued public employment, then they are entitled to due process before the government may deprive them of their jobs. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Property interests are not created by the Constitution, but by external sources such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). They exist when a person has not just a unilateral expectation, but a legitimate claim of entitlement to the government benefit. *Id.* To constitute a property interest, there must be "rules or mutually explicit understandings that support [the]

claim of entitlement to the benefit." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The "hallmark" of a property interest "is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) (citations omitted). Thus, if a public employee may only be terminated for cause, the employee possesses a property interest in his or her employment. *Richardson v. Felix,* 856 F.2d 505, 509 (3d Cir.1988).

█ In the present case, we must look to the state law of Delaware and to Ordinance No. 54 of the Town of Fenwick Island to determine whether plaintiffs possessed property interests in their employment. Arguably, 11 *Del.C.* § 9203 (1987) prevents termination of any police officer except for cause. That statute provides that any officer is entitled to a hearing conducted pursuant to specified procedures if charged with any type of disciplinary infraction. The Third Circuit has held that if a state statute provides detailed procedures to be followed when terminating a police officer for cause, then officers cannot be terminated at will or else the statutory procedures would be meaningless. *Richardson,* 856 F.2d at 509.

Yet, we need not rely on this Delaware statute to conclude that plaintiffs may only be terminated for cause. Under Section 8(2)(d) of Fenwick Island Ordinance No. 54, the Town Council may terminate a part-time police officer "if it appears that he does not have the qualities which the Council feels are necessary to meet the needs of the Town." Although the ordinance does not specify what qualities are necessary, it does require that the government possess a reason related to the officer's assigned duties in order to terminate the officer. In addition, the ordinance requires a hearing before any type of disciplinary action may be taken against an officer, and sets forth specific procedures that must be followed. Finally, plaintiffs' hold positions as "Regular *Permanent* Part–Time" employees under Section 2(B)(1) of the ordinance. Des-

ignating a position as a permanent one is evidence that the employee is terminable only for cause. *See Aiello v. City of Wilmington,* 426 F.Supp. 1272, 1286 (D.Del. 1976). Thus, we conclude that plaintiffs do possess property interests in their positions with the Fenwick Island Police Department.

█ Since plaintiffs' interests are property interests protected by the Due Process Clause, they cannot be terminated from their jobs without a hearing. Although a post-deprivation hearing may suffice for a suspension, *see FDIC v. Mallen,* 486 U.S. 230, 108 S.Ct. 1780, 1787–88, 100 L.Ed.2d 265 (1988), and even a termination need not be preceded by a full evidentiary hearing, plaintiffs are entitled to a pretermination hearing providing at least minimal due process protections. More specifically, even when quick removal of a public employee is necessary, the employee is still entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" prior to being terminated. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).

There can be no dispute that defendants did not provide plaintiffs with such notice and an opportunity to respond before plaintiffs were officially separated from their positions. Negley and Clower did not even contact plaintiffs to inquire as to the reasons for their absences, and the July 8th and 11th letters did not offer plaintiffs a chance for each to present his side of the story before any decision would be final. The fact that plaintiffs were subsequently given a public hearing is insufficient, because the due process clause "requires 'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* at 542, 105 S.Ct. at 1493 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)). This requirement stems in part from the desire to minimize the risk of erroneous terminations, *see id.* 470 U.S. at 542–43, 105 S.Ct. at 1493, and

the Fenwick Island Town Council's subsequent decision to reinstate plaintiffs indicates that a pretermination hearing in the present case may have had precisely this effect. *See id.* at 544, 105 S.Ct. at 1494 ("The fact that the Commission saw fit to reinstate [the employee] suggests that an error might have been avoided had he been provided an opportunity to make his case" prior to his termination.). Thus, if the "voluntary quit" letters did in fact constitute letters of termination, then defendants have violated plaintiffs' rights to procedural due process.

■ Plaintiffs also allege that defendants' acts deprived them of a liberty interest without due process. They assert that the actions at issue in this case were extensively publicized, including dissemination of false allegations regarding plaintiffs' behavior. They contend, citing *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), that these allegations damaged each plaintiff's "good name, reputation, honor, [and] integrity." *Id.* at 437, 91 S.Ct. at 510. The Supreme Court has since held that the stigma of defamation standing alone does not implicate any liberty interest, but must occur in the course of an impairment of an additional state protected interest, such as the termination of employment. *Paul v. Davis*, 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976). Thus, a liberty interest is implicated when "the alteration of legal status [is] combined with the injury resulting from the defamation." *Clark v. Township of Falls*, 890 F.2d 611, 619 (3d Cir. 1989). To prove such a claim, the plaintiff must also demonstrate that the publicized allegations are false. *Fraternal Order of Police, Lodge No. 5 v. Tucker*, 868 F.2d 74, 82 (3d Cir.1989).

We cannot determine from the present record whether plaintiffs will be able to prove their liberty interest claim. First, these claims are dependent upon plaintiffs' ability to establish that they were indeed terminated from their employment, and thereby suffered a deprivation beyond the harm to their reputations. Second, the present record does not indicate whether the information was publicized by defen-

dants, nor is it clear that the publicized information was not true. Should plaintiffs be able to establish such a liberty interest, however, they would be entitled to procedural due process before being deprived of this interest.

As for the property interest claim, we can confidently conclude that plaintiffs possessed property interests in their positions with the Police Department, and that no due process was provided prior to plaintiffs losing their jobs in early July, 1989. The only question remaining is whether defendants deprived plaintiffs of their interests or whether plaintiffs voluntarily relinquished their entitlements. In fact, on the record before us regarding the nature of defendants acts, we are almost prepared to grant partial summary judgment sua sponte for plaintiffs on their claims for deprivation of property without due process. We decline to do so, however, because the issues have not been sufficiently briefed.

Thus, we conclude that the record presents genuine issues of material fact as to the true nature of Negley and Clower's acts. Consequently, defendants' argument that they have committed no wrong does not warrant granting summary judgment in their favor.

### B. *Qualified Immunity*

■ Negley and Clower next contend that even if their actions are determined to have violated the Fourteenth Amendment, they, as town officials, are protected by qualified immunity. Under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), government officials performing discretionary functions are immune from liability for damages so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. To be considered a "clearly established" right under this standard, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640,

107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). There need not have been an actual case holding that the specific conduct at issue is unlawful, but the unlawfulness of the action in question must be apparent from previous court decisions. *Id.; accord Brown v. Grabowski*, 922 F.2d 1097, 1109–11 (3d Cir.1990).

■ Thus, if there is no precedent directly on point, an official is protected by qualified immunity if "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Social Services for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989). The official's actual state of mind is irrelevant. *Ryan v. Burlington County*, 860 F.2d 1199, 1206 n. 12 (3d Cir.1988), *cert. denied sub nom. Fauver v. Ryan*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

■ The events at issue in this case occurred in July, 1989. The law outlined in Section I.A. above regarding the rights of public employees to procedural due process prior to being terminated, was clearly established at that time. Nearly all the procedural due process decisions we have cited, as well as Fenwick Island Ordinance No. 54, pre-date July, 1989. In particular, it was established by Supreme Court decisions starting with *Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and from decisions of the Third Circuit such as *Richardson v. Felix*, 856 F.2d 505, 509 (3d Cir. 1988), that a public employee who may only be terminated for cause has a property interest in his or her employment.

Moreover, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985), held in no uncertain terms that government employees must be given notice of the charges against them, an explanation of the government's evidence, and an opportunity to respond before they can be terminated. In fact, the Court found in *Loudermill* that the right of a public employee to a hearing before being discharged from a position in which he or she has a property interest "has been settled for some time now." *Id.* at 542, 105 S.Ct. at 1493.

In fact, defendants do not even attempt to argue that these rights were not clearly established at the time of the actions in question. Rather, they contend first, that Negley and Clower did not violate any rights, and second, that even if Negley and Clower were simply wrong in interpreting plaintiffs' acts as resignations, they are still immune because they acted in good faith. We have addressed the first argument above, and simply note here that if there was no violation, then it is irrelevant whether Negley and Clower were protected by qualified immunity. As to the second argument regarding a good faith defense, defendants rely inexplicably on a district court case decided seven years before the Supreme Court decided *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow*, as defendants recognize earlier in their brief, the Court adopted an objective standard for qualified immunity, and abolished the previous subjective good faith test. *Id.* at 815–19, 102 S.Ct. at 2736–39. As we noted above, under *Harlow* and *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the actual state of mind of the government official is irrelevant. *See Ryan v. Burlington County*, 860 F.2d 1199, 1206 n. 12 (3d Cir. 1988), *cert. denied sub nom. Fauver v. Ryan*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

Therefore, Negley and Clower are not protected by qualified immunity for the acts at issue in this case. As a result, we will not grant summary judgment in favor of these two defendants.

### C. Liability of the Town of Fenwick Island

Defendants further argue that the Town of Fenwick Island cannot be held liable under 42 U.S.C. § 1983 (1988) for the acts of Negley and Clower. They point out that under *Monnell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality may only

be held liable under Section 1983 when the acts at issue "may fairly be said to represent official policy," *id.* at 694, 98 S.Ct. at 2037–38, and state that no such official policy was involved in the present case. We agree, although for different reasons than those asserted by defendants.

Defendants contend that more than one single incident is necessary to establish an official policy under *Monnell.* Although the decision was not cited by either party, the Supreme Court addressed this precise issue in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and held that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 480, 106 S.Ct. at 1298. More specifically, the Court held that under Section 1983, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481, 106 S.Ct. at 1299. The difficulty in applying this standard, is determining whether the particular official is one whose acts may be said to constitute governmental policy.

In *Pembaur,* a plurality of four justices headed by Justice Brennan went on to define the type of official whose acts may constitute official policy as those "officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300. The plurality also stated that the fact that an official may exercise discretion in performing his or her duties is not sufficient. *Id.* at 481–82, 106 S.Ct. at 1299. Subsequently, in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988), a different plurality of four justices headed by Justice O'Connor adopted the "final policymaking authority" formula from *Pembaur,* thereby creating a total of seven justices who had done so. Furthermore, a majority of the Court later reaffirmed this standard in *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989), and instructed trial judges to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue."

The O'Connor plurality in *Praprotnik* further stated that the question of whether a given official possesses such authority is a question of state law. 108 S.Ct. at 924. This requirement was also reaffirmed in *Jett. See* 109 S.Ct. at 2723. In addition, the plurality and the concurrence in *Praprotnik* agreed that if the authorized municipal policymaker has established a certain policy, and then delegated the responsibility for its implementation to another official, the municipality will not be liable if the implementing official exercises his or her discretion in an unconstitutional manner. 108 S.Ct. at 925–26 (plurality); *id.* at 931 (Brennan, J. concurring). As the plurality stated, "[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* at 926.

■ This series of decisions has provided us with standards for municipal liability under Section 1983 to which a majority of the Supreme Court has agreed. Applying these standards in the present case, we note that the local law provides, under Section 8(2)(d) of Ordinance No. 54, that the authority to terminate part-time police officers is vested in the Fenwick Island Town Council. Under the ordinance, Negley, as President of the Town Council, and Clower, as Commissioner of Public Safety and a Councilman, could not terminate any officer without the cooperation of the full Council. Thus, Negley and Clower did not possess "final policymaking authority" for the Town of Fenwick Island as to terminations. As a result, even if Negley and Clower did actually violate plaintiffs' constitutional rights by terminating them without providing procedural due process, their actions are not chargeable to the municipality.

Our conclusion is strengthened by the fact that the Town Council, once notified of Negley and Clower's acts, did actually conduct a public hearing as required by Ordinance No. 54. Moreover, after the hearing the Council voted unanimously to rescind both sets of "voluntary quit" letters. Thus, to the extent that Negley and Clower departed from official policy and acted to deny plaintiffs due process of law, the body that possessed final policymaking authority acted to remedy any such denial by implementing the actual official policies of the town.

Therefore, the Town of Fenwick Island cannot be held responsible for Negley and Clower's acts under 42 U.S.C. § 1983 (1988). Consequently, we will grant summary judgment in favor of the town on plaintiffs' due process claims.

### D. *Pendent Jurisdiction*

The final argument raised in defendants' summary judgment motion is that if this Court grants summary judgment for all defendants on plaintiffs' constitutional claims, then the Court should exercise its discretion to dismiss plaintiffs' pendent state claims. As outlined above, however, we will deny summary judgment on the constitutional claims against Defendants Negley and Clower. Since, as defendants acknowledge, the federal and state claims arise out of a common nucleus of operative fact, plaintiffs' state claims fall within this Court's pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Consequently, we will deny defendants' request that we dismiss the state law claims.

## II. PLAINTIFFS' MOTION TO AMEND THE COMPLAINT

■ Together with their answering brief regarding defendants' summary judgment motion, plaintiffs filed a motion to amend their complaint. The proposed amendment would add a count alleging that defendants retaliated against plaintiffs after they filed the present suit. Defendants oppose the motion to amend.

Under Fed.R.Civ.P. 15(a), leave to amend pleadings "shall be freely given when justice so requires." Amendments should be denied only for reasons such as "undue delay, bad faith or dilatory motive ... [or] undue prejudice to the opposing party." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In determining whether to permit an amendment, "prejudice to the non-moving party is the touchstone." *Cornell and Co. v. Occupational Safety and Health Review Comm'n*, 573 F.2d 820, 823 (3d Cir.1978).

Defendants' principal argument is that plaintiffs' proposed amendment "is made solely to thwart resolution of the case based on defendants' constitutional arguments by injecting new claims into the litigation." They contend that their summary judgment motion, if successful, would eliminate plaintiff's constitutional claims, and then the remaining pendent state claims could, in the Court's discretion, be dismissed. We do not find, however, that plaintiffs' motion to amend was filed with any improper purpose. Moreover, since we have rejected defendants' motion for summary judgment as to the constitutional claims against Negley and Clower, this Court will retain jurisdiction over this action whether or not plaintiffs' are permitted to amend their complaint.

■ Defendants also assert that plaintiffs have had almost seventeen months in which to amend the complaint, and have unnecessarily delayed in filing their motion. Yet, delay alone does not warrant denial of leave to amend a pleading, *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984), and there is no evidence of any undue or unexplained delay indicating bad faith by plaintiffs. *See Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 93 F.R.D. 858, 865 (D.Del. 1982). Moreover, in this action, this Court has not yet set either a final discovery deadline or a deadline for motions to amend the pleadings. In the Rule 16 scheduling Order of November 6, 1989, we only set a deadline for discovery relating to case dispositive motions and a briefing schedule

for the motion to dismiss which defendants had already filed.

Thus, defendants have not shown that they will suffer any prejudice if plaintiffs are permitted to amend their complaint. We will therefore grant the motion to amend.

## CONCLUSION

For the reasons we have stated, defendants' summary judgment motion will be granted in part and denied in part. We will grant summary judgment in favor of the Town of Fenwick Island on plaintiffs' procedural due process claims under 42 U.S.C. § 1983 (1988), but will deny summary judgment as to Defendants Negley and Clower. We will also grant plaintiffs' motion to amend the complaint. An appropriate order will follow.