Atchley **RICHARDSON**

v.

Otis L. **FELIX, Individually and as Commissioner of Public Safety, and the Government of the Virgin Islands.**

Appeal of **GOVERNMENT OF THE VIRGIN ISLANDS.**

No. 87–3540.

United States Court of Appeals, Third Circuit.

Argued April 22, 1988.

Decided Aug. 17, 1988.

Rehearing and Rehearing In Banc Denied Sept. 19, 1988.

Denise R. Reovan (argued), Government of the Virgin Islands, Office of Collective Bargaining, Charlotte Amalie, St. Thomas, U.S. Virgin Islands, for appellant.

Judith L. Bourne (argued), Charlotte Amalie, St. Thomas, U.S. Virgin Islands, for appellee.

Before SEITZ, SLOVITER, and BECKER, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

Defendant Government of the Virgin Islands ("Government") appeals the final judgment of the district court in favor of plaintiff Atchley Richardson. This court has jurisdiction under 28 U.S.C. § 1291 (1982).

### I.

The following facts are undisputed. In August 1980, Richardson was hired as a member of the Virgin Islands Police Auxiliary ("Auxiliary"). The Auxiliary, known until 1978 as the Home Guard, is part of the Department of Public Safety ("Department") and is under the command of the Commissioner of Public Safety ("Commissioner").[1]

The duties of members of the Auxiliary are set forth in general terms at V.I.Code Ann. tit. 23, § 1157 (Supp.1987), which states that "[m]embers of the Police Auxiliary shall cooperate with the police force at all times and shall perform such other duties as may be prescribed by the Governor. During times of emergency, proclaimed by the Governor, they shall be vested with full police authority." The duties of Auxiliary members are described in somewhat more detail in regulations issued by the Commissioner in 1980 under the authority of V.I.Code Ann. tit. 23, § 1153 (Supp.1987). Those regulations indicate that members perform such functions as controlling crowds, directing traffic, and issuing traffic citations. V.I. R. & Regs. tit. 23, § 1153–4 (1982). In addition, members patrol in pairs with police officers and generally assist police officers in their law enforcement duties. *Id.*

Before joining the Auxiliary, Richardson was required to pass a physical examination and complete a training course. *Id.* § 1153–3. While on duty, he wore a uniform similar to that worn by regular police officers, *id.* § 1153–6, and carried a firearm.

---

1. In 1984 the Department was renamed the Police Department, and the Commissioner's title became Police Commissioner. *See* Act No. 4964, 1984 V.I. Sess. Laws 177.

In 1981 Richardson applied to the Department for a position on the regular police force. As part of the application process, he was required to submit to psychological testing. The results of Richardson's psychological tests came to the attention of the Commissioner, Otis L. Felix. On the basis of those results, Felix determined that Richardson was unsuited to continued service in the Auxiliary. By letter dated May 11, 1982, Felix in effect demanded that Richardson resign from the Auxiliary or face termination.[2] Richardson chose to resign.

In March 1984, Richardson commenced this action under 42 U.S.C. § 1983 (1982), against Felix and the Government. Richardson claimed that his forced resignation without prior notice or hearing violated his due process rights. He also asserted that the Department violated his right to equal protection by terminating him on the basis of his performance on the psychological tests when other Auxiliary members were not required to take or pass such tests.

The case was tried to the court. In its memorandum opinion, the court assumed that Richardson's resignation amounted to a termination by the Department. The court held that the Government had denied Richardson due process by terminating him without first giving him notice and an opportunity to be heard. The court found no liability on Felix's part. It did not address Richardson's equal protection claim. The Government was ordered to reinstate Richardson to his position on the Auxiliary and to remit back pay. This appeal by the Government followed. Richardson does not cross-appeal the court's disposition of his claims against Felix.

## II.

To the extent that the judgment of the district court rests upon conclusions of law, our review is plenary. We shall not set aside the court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a).

One who has been dismissed from public employment must make two showings to establish that the dismissal violated due process: (1) that the dismissal deprived him of a property or liberty interest, and (2) that the employer did not afford him adequate procedural protections in connection with the action. *Federal Deposit Ins. Corp. v. Mallen*, —— U.S. ——, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988); *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538–41, 105 S.Ct. 1487, 1491–93, 84 L.Ed.2d 494 (1985). In the absence of circumstances requiring his prompt removal, an employee with a protected interest in his employment may be terminated only after receiving notice of the charges against him and an opportunity for a hearing sufficient to respond to those charges. *Id.* at 542–48.

The issue in this case is a narrow one. The Government does not now dispute that Richardson's resignation amounted to a dismissal by the Department. In addition, it is undisputed that Richardson was not given any notice or chance for a hearing before his termination became a *fait accompli*, and the Government does not point to any circumstances that made such pre-termination notice and hearing impractical. Thus, Richardson prevails on his due process claim if he can establish that his dismissal deprived him of a protected interest. Richardson claims to have had a property interest in his continued employment with the Auxiliary. The district court agreed.

The "property" interests protected by the due process clause of the fourteenth amendment "are created and their dimen-

---

**2.** Felix's letter was admitted as evidence at trial. The text of the letter read in its entirety as follows:

Based upon a recent psychological report [sic] which you underwent on May 3, 1982, I must regretfully inform you that I will accept your resignation from the Auxiliary immediately.

I would much prefer you do it this way than have to terminate your services in any other way.

. I will be glad to discuss this matter with you person to person at your earliest convenience.

sions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Richardson maintains that his property interest in employment as a member of the Auxiliary derives from the Virgin Islands statute governing the territory's Personnel Merit System. V.I.Code Ann. tit. 3, §§ 451–690 (1967 & Supp.1987). Our analysis focuses on the interaction of two sections of that statute, sections 451a and 530. V.I.Code Ann. tit. 3, § 451a (Supp.1987); V.I.Code Ann. tit. 3, § 530 (1967 & Supp.1987).

Section 451a divides all positions in the government service into two categories: the "career service" (formerly known as the "classified service") and the "exempt service" (formerly known as the "unclassified service").[3] Section 451a(c) states that "[a]ll positions in the Executive branch of the Virgin Islands Government not exempted under subsection (b) of this section shall be in the career service." It is clear that the Auxiliary is within the Executive Branch of the Government. *See* V.I.Code Ann. tit. 23, § 1152(b) (Supp.1987) ("The Governor shall act as the Chief Executive Officer of the Police Auxiliary."). Accordingly, members of the Auxiliary are in the career service unless their positions come within one of the exemptions set forth in section 451a(b). The only exemption that is arguably applicable to Richardson is one that excludes employees who perform "casual labor" or "part-time labor for less than 20 hours per week."

The district court determined that Richardson's service on the Auxiliary did not constitute casual labor. There is ample support for that conclusion. The regulations promulgated by the Director of Personnel define "casual labor" as "persons employed on an irregular or occasional basis, who are compensated only for the time when actually employed or for services actually rendered, and who are employed for periods of less than one year." V.I.R. & Regs. tit. 3, § 452–1(a) (1986). The record shows that Richardson served as a member of the Auxiliary continuously for almost two years and worked regular shifts. Such employment cannot possibly be viewed as irregular or occasional.

The district court also found as a fact that Richardson normally worked as an Auxiliary member for twenty hours per week and therefore did not fall within the statutory exemption for "part-time labor for *less than* 20 hours per week" (emphasis added). This finding is supported by the record. Richardson testified at trial that he normally worked twenty hours per week. He conceded that he "sometimes" worked fewer than twenty hours, but he also stated that he worked more than twenty hours "a good amount of [the] time." The court's finding is also supported by the trial testimony of David Canton, who was Police Chief at the time Richardson was terminated and in that capacity supervised the work of the Auxiliary. He testified that at one point Auxiliary members worked forty hours per week but that because of budget constraints they were subsequently limited to twenty hours per week. Canton also corroborated Richardson's testimony that Richardson normally worked twenty hours per week. The Government offered no evidence to contradict the testimony of Richardson or Canton on that point. In light of the record, we conclude that the district court's finding that Richardson was not a part-time employee for less than twenty hours per week was not clearly erroneous. Given that Richardson's employment with the Auxiliary was neither "casual labor" nor "part-time labor for less than twenty hours per week," it follows that Richardson qualified

---

**3.** The current terminology was adopted when section 451a was enacted in 1968. *See* Act No. 2311, 1968 V.I.Sess.Laws 271. However, some provisions of the personnel statute have not been amended to conform to that usage. *See, e.g.*, V.I.Code Ann. tit. 23, § 451 (1967). Section 451a(d) provides that "[t]he terms 'career service' and 'exempt service' are intended to be synonymous with the terms 'classified service' and 'unclassified service,' respectively, as heretofore used in this Code."

as a member of the career service under section 451a.

We next consider the effect of section 530. That section reads in pertinent part as follows:

> (a) [W]here a department head ... decides to dismiss, demote, or suspend a regular employee ... for cause, he shall furnish the employee with a written statement of the charges against him. The employee shall have ten days following the receipt of said statement of the charges to appeal the proposed action to the Government Employees Service Commission.

Other portions of the section set forth the procedures to be followed during and after the employee's appeal to the Government Employees Service Commission.

We note initially that section 530(a) speaks not of "career service" employees but of "regular" employees. The two terms are not interchangeable. A regular employee is one "who has been appointed to a position in the [career] service in accordance with this chapter [relating to the Personnel Merit System] after completing his working test period." V.I.Code Ann. tit. 3, § 451 (1967). Regular employees constitute one of two subsets within the career service. The other subset consists of probationary employees, those who have not yet completed their working test period. *See id.* § 527.

To receive the benefit of section 530, then, Richardson must have been at the time of his termination not only a career service employee but also a regular employee. The record does not indicate whether Richardson served a probational period and, if so, how long the period lasted, but that deficiency is not critical. The personnel regulations provide that the maximum length of an employee's probational period shall be no more than twelve months. V.I. R. & Regs. tit. 3, § 452–161(b) (1986). Richardson's employment lasted almost twenty-one months. Thus, even if we assume that Richardson served a probational period and that this period extended for the maximum permissible length of time, it is clear that he attained "regular" status well before he was terminated.

Because Richardson was a regular employee at the time of his dismissal, section 530 applied to him. The final step in our analysis is to determine whether section 530 gave him a property right in his employment as a member of the Auxiliary.

The hallmark of a constitutionally protected property interest is an individual entitlement that "cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). Section 530 does not explicitly state that regular employees may be terminated *only* for cause, but that is its plain meaning. The section prescribes detailed procedures that the Government must follow when terminating regular employees for cause. If regular employees were terminable at will —that is, for reasons other than "cause"— the provision would be meaningless. A department head could characterize every discharge as an at-will termination and thereby avoid having to follow the specified procedures. Section 530 therefore gave Richardson a property interest in continued employment.[4] *Accord Schuster v. Thraen*, 18 V.I. 287, 296 (D.V.I.1981).

The Government's assertions to the contrary are not compelling. The Government sets forth three principal arguments as to why Richardson did not have a property interest in his employment. First, the Government asserts that he could not have had an entitlement to continued employment because, under V.I.Code Ann. § 1156

---

**4.** Richardson testified on cross-examination that he knew he was not a "permanent employee," but that is irrelevant to the question of whether he had a property interest in his employment. It is well-settled that the existence of a constitutionally protected property interest does not turn on the claimant's subjective expectation. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. More-

over, Richardson's statement is ambiguous: he may have understood "permanent" employment to be that which cannot be terminated for *any* reason. (Counsel for the Government did not attempt to clarify Richardson's statement.) Whether Richardson had a property interest in his employment is obviously unrelated to the "permanence" of the employment *in that sense.*

(1967), he was not an employee of the Government at all. The version of section 1156 in effect at the time of Richardson's termination was entitled "Remuneration of members of the Home Guard." It began by setting forth the procedure for paying Auxiliary members. It then stated as follows:

> Notwithstanding any of the foregoing, members of the Home Guard shall not, by virtue of their service as such members, be considered employees of the Government of the Virgin Islands, and shall not be entitled, on account of such service, to leave benefits, to participation in the Employees Retirement System of the Government of the Virgin Islands, or to any similar benefit or program.[5]

The Government does not and cannot dispute that Richardson was an "employee" of the Government in the ordinary sense of that term: he performed services for the Government, was paid by the Government, and worked under the direction of Government officials. Rather, the Government's argument seems to be that "employee" was used in section 1156 as a term of art and that, by defining Auxiliary members as not being employees of the Government, the section excluded members from the broad-sweeping definition of the "career service" contained in section 451a(c).

We find this argument unpersuasive. As noted above, section 1156 concerns the remuneration of Auxiliary members. The Government's reading of the provision would extend its reach far beyond the pecuniary relationship between the Government and Auxiliary members. The Government offers no explanation as to why the Virgin Islands legislature would have used that section as the vehicle for completely excluding Auxiliary members from the operation of the Personnel Merit System. Moreover, the Government's attempt to portray

section 1156 as carving out an exception to section 451a(c) is at odds with the plain language of the latter provision, which states that the career service encompasses all positions in the executive branch not exempted under subsection (b) of section 451a. This language indicates that the only permissible exceptions to section 451a(c) are those that appear in section 451a itself. Rather than accept the Government's reading of the above-quoted language of section 1156, we read that language simply to mean that Auxiliary members are ineligible to participate in compensation and benefits programs in which eligibility is keyed to "employee" status.[6]

The Government's second argument relies on a different portion of section 1156 that stated that members of the Auxiliary are to be paid "in accordance with the procedure for payment of unclassified employees of the Government of the Virgin Islands." The Government offers this as another indication that the legislature intended to exclude Auxiliary members from the career service. This argument fails for the reasons stated in the preceding paragraph.

Finally, the Government disputes the conclusion that Richardson was not a part-time employee, pointing to two sources in support of its position. First it cites certain language in the Commissioner's regulations stating that Auxiliary members "will be utilized on a *part-time* basis in nonemergency situations." V.I. R. & Regs. tit. 23, § 1153–4(a) (1982) (emphasis added). Second, the Government relies on two standard-form documents, known as Notices of Personnel Action ("NOPA"s), that were admitted as evidence at trial. The earlier of the NOPAs was prepared at approximately the time that Richardson be-

---

**5.** In 1984, after Richardson's termination, the former section 1156 was repealed and replaced by a similar provision that does not contain the quoted language. *See* Act No. 5028, 1984 V.I. Sess.Laws 408, 410.

**6.** The Government maintains that the reading we adopt is flawed because it renders redundant the language following the phrase "and shall not be entitled." We need only note that the

Government's interpretation is similarly flawed: it makes the language *preceding* that phrase redundant because eligibility for leave and retirement benefits and related programs is limited by statute to "employees." Given that section 1156 is somewhat inartfully drafted, we prefer the interpretation that is more consistent with the obviously limited purposes of the provision.

gan his service with the Auxiliary. In one place on the form is a space labeled "Classification" that is to be filled in with a number corresponding to a legend that appears immediately above: "1. unclassified; 2. classified; 3. temporary; 4. part-time." That space contains the notation "3," indicating temporary employment. Another space on the form is labeled "Nature of Action" and contains the words "Part-time employment." A third space is labeled "Explanatory Remarks"; it contains the notation "Part-time employment as authorized by Act # 4115." [7] The second NOPA was prepared in May 1981 when Richardson received a raise. There the space labeled "Classification" contains the notation "4," indicating part-time employment.

The Government's argument on this point is somewhat ambiguous. On one hand, the Government appears to contend that the NOPAs establish Richardson's status as a part-time (and therefore exempt service) employee *as a matter of fact.* The NOPAs, however, are not sufficient to show that the district court committed clear error in finding that Richardson normally worked twenty hours per week. Indeed, the label "part-time" is essentially irrelevant. Section 451a(b) requires the inquiry to focus not on the characterization of employment as "part-time" or "full-time" but on whether the particular employee worked the requisite number of hours per week. The NOPAs do not speak to that issue.

An alternative reading of the Government's argument is that the NOPAs and the quoted regulation establish Richardson's part-time status *as a matter of law.* On this view, the NOPAs and the regulation reveal an administrative decision that Auxiliary members, regardless of their actual working hours, should not be regarded as career service employees under section 451a. We reject this reasoning. It is axiomatic that an administrative regulation or

practice cannot validly contradict a clear legislative policy. *Colgate–Palmolive–Peet Co. v. National Labor Relations Bd.,* 338 U.S. 355, 363, 70 S.Ct. 166, 171, 94 L.Ed. 161 (1949). Section 451a reflects a clear legislative policy that all employees in the executive branch must, unless they fit within exceptions not relevant here, be considered members of the career service if they work twenty or more hours per week. The administrative practice of referring to Auxiliary members as part-time employees cannot change that scheme.

We recognize that our analysis here may produce anomalous results. Richardson, by virtue of having worked twenty hours per week, is a member of the career service and is terminable only for cause. But another Auxiliary member who performs identical duties for nineteen hours per week is terminable at will. The practical justification for such a distinction may be open to question, but that is the distinction the Virgin Islands legislature has chosen to draw. Any anomalies derive solely from the legislature's decision to make career service status turn on the number of hours per week that an employee works.

### III.

For the foregoing reasons, we hold that Richardson had a property interest in his employment with the Auxiliary. The Government violated Richardson's due process rights by depriving him of that interest without a prior notice and hearing. The district court ordered that Richardson be reinstated to his position on the Auxiliary and awarded back pay. On appeal the Government makes no specific objections to the propriety of those remedies. After Richardson's reinstatement, of course, the Government may seek to terminate him for cause so long as it complies with the constitutionally mandated notice and hearing requirements.[8] *See Skehan v. Board of*

---

7. Act No. 4115 enacted the current version of V.I.Code Ann. tit. 23, § 1154 (Supp.1987), which concerns membership in the Auxiliary. *See* 1978 V.I.Sess.Laws 53. Section 1154 makes no explicit reference to part-time employment.

8. As noted earlier in our discussion, section 530, the provision that makes regular employees terminable only for cause, also sets forth procedures for the termination of such employees. *See* V.I.Code Ann. tit. 3, § 530(b)-(f) (1967 & Supp.1987). We need not express any opinion

*Trustees,* 590 F.2d, 470, 493–94 (3d Cir. 1978), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979).

Accordingly, the judgment of the district court will be affirmed.

BECKER, Circuit Judge, dissenting.

Addressing what can only be characterized as a legislative hodgepodge, Judge Seitz has written a forceful opinion. I think, however, that the Virgin Islands legislature will be surprised to learn that it has created a constitutionally protected property interest in continued employment in favor of the occupant of a position that it had excluded from the civil service and from leave and pension and similar benefits; that it had lumped together with, *inter alia,* the Volunteer Fire Service and Radio Citizens Teams in providing that employment status existed only for purposes of workers' compensation; and that was officially classified on the police department's personnel records as either "temporary" or "part-time." For these and other reasons set forth below, Judge Seitz has not persuaded me that the legislature intended to confer such a significant interest upon an auxiliary policeman whose prime duties during his 20–hour per week tour of duty are crowd and traffic control.

## I.

I begin with Section 1156 of title 23 of the Virgin Islands Code, which declares that "members of the Home Guard [now Police Auxiliary] shall not, by virtue of their service as such members, be considered employees of the Government of the Virgin Islands." The majority acknowledges the troublesome nature of § 1156, yet discounts the significance of this legislative pronouncement merely because the section deals primarily with remuneration. *See* Majority Opinion *supra,* at 510. I am more willing, however,

to attach significance to the language of the statute. It seems plain from that language, particularly in light of the role of an auxiliary policeman, that the Virgin Islands legislature intended to exclude such policemen from any (property) rights or privileges that might accompany employment status. The statute makes clear that for no purposes other than receipt of remuneration for services are auxiliary policemen to be considered employees of the government.

I of course agree with the majority that, "in the ordinary sense of th[e] term," Richardson plainly was an "employee" of the government. *See* Majority Opinion *supra,* at 510. The issue, however, is not whether Richardson worked for the government, it is whether the statutory employment scheme granted Richardson any rights of employment beyond payment for services rendered. I believe that the unwillingness of the legislature to label Richardson an "employee" is highly probative of a legislative intent to deny Richardson any asserted right to *continued* employment.

Moreover, the very same section makes clear that, to the extent auxiliary police must be treated as employees for remunerative purposes, they are to be paid "in accordance with the procedure for payment of *unclassified* employees." V.I.Code Ann. tit. 23, § 1156 (1970) (emphasis added). I view this, at the very least, as an expression of the sense of the legislature that auxiliary police are not to be considered members of the civil service.

A separate statutory provision provides further evidence of legislative intent. Section 282 of Title 24 of the Virgin Islands Code grants workers' compensation benefits to members of the Police Auxiliary in spite of their non-employee status. This provision would be unnecessary if members of the auxiliary police force were members

as to whether those procedures satisfy the constitutional minima specified in *Loudermill,* 470 U.S. at 542–48, 105 S.Ct. at 1493–97. Likewise, we have no occasion to decide whether Richardson's performance on the psychological tests amounts to "cause" sufficient to justify his discharge under section 530.

The district court found it unnecessary to address Richardson's equal protection claim, and we do not consider it here. Richardson is free to reassert that claim if, after his reinstatement to the Auxiliary, the Government again discharges him on the basis of his psychological tests.

of the civil service and entitled to the accompanying rights of continued employment. It would be an odd scheme indeed if auxiliary police were entitled to the rights of the civil service system while their right to workers' compensation benefits was in doubt.

Indeed, the same provision provides even more telling evidence of the views of the Virgin Islands legislature with regard to the Police Auxiliary. In granting workers' compensation benefits to the auxiliary police force, the legislature grouped the Auxiliary with the National Guard, the Civil Defense Volunteer Corps, the Volunteer Fire Service, "civil defense workers, Radio Emergency Associated Citizens Teams, [and] volunteers from outside the Territory who, at the request of the [Government], render service in the Virgin Islands in connection with an emergency or a disaster." The statute provides benefits to "members, officers and trainees" of each of these organizations or groups. *See* V.I.Code Ann. tit. 24, § 282(a) (Supp.1986). It seems plain to me that the legislature viewed the members, officers and trainees of each of these organizations as similarly situated to one another for employment purposes, and I believe it highly doubtful that the legislature intended to accord these emergency volunteer workers protected employee status.

## II.

The majority relies heavily for its contrary conclusion on the fact that § 451a of title 3 appears to make *all* positions in the Executive Branch either classified *or* unclassified, and that those not expressly exempted are to be considered classified. *See* Majority Opinion *supra*, at 508. While I readily concede that Richardson's position was not expressly exempted, because he could not be considered "part-time" within the meaning of § 451a(b)(5), it is also apparent to me that, in drafting § 451a, the legislature simply was not contemplating

that the Government Service would encompass *non-employee* auxiliary policemen.

I find support for this position in the Notices of Personnel Action ("NOPAs"), which the majority somewhat cavalierly discards. *See* Majority Opinion *supra*, at 511–12. I agree with the majority that an administrative practice cannot reverse a *clear* legislative policy and that therefore any administrative determination that Richardson was a "part-time" laborer cannot be dispositive given the clear legislative pronouncement that, for civil service purposes, a part-time worker is one who works less that twenty hours per week. However, in view of the statutory inconsistencies, I do not find the legislative policy concerning the classified status of government workers at all clear, and hence I believe that the administratively-issued NOPAs can illuminate the issue for us.

The NOPAs provide strong indication that the government contemplated *four* different categories of government workers: in addition to the statutorily-defined classified and unclassified workers, the NOPAs also recognize that there are "temporary" and "part-time" workers who fit into *neither* of the ·two standard categories.[1] Hence, in my view, the mere fact that the position of a non-employee auxiliary crowd control officer is not expressly exempted from the civil service is not dispositive of his status. I believe Richardson's position was neither classified *nor* unclassified, but at all events not protected.

The flaw in the majority's analysis thus stems in significant part from its "either/or" predicate, i.e., its supposition that § 451a(c) contemplates only two types of positions—classified and unclassified (or career and exempt)—and from its concomitant conclusion that if Richardson is not in the exempt or unclassified group he must be protected. Trying to render sense out of the hodgepodge, it appears to me that Richardson may qualify as neither classi-

---

1. Section 498 of title 3, enacted in 1986, after Richardson's termination, demonstrates that even the legislature contemplated types of positions other than classified and unclassified, as it grants the right to elect to join the classified

service to "[a]ny executive branch employee in an unclassified *or temporary* position" who has served for more than two years. V.I.Code tit. 3, § 498(a) (Supp.1987).

**514**

fied nor unclassified. At all events, he was, in my view, terminable at will, with no legitimate expectation of continued employment, and hence he had no state created constitutionally protected property interest in his job.

### III.

I note finally the majority's contention that § 530, which grants a property interest in one's job to all "regular employees," applies to Richardson because he has completed his probationary period. *See* Majority Opinion *supra*, at 509; V.I.Code Ann. tit. 3, § 530 (1967). Yet the majority acknowledges that a "regular employee" is one "who has been appointed to a position in the [career] service *in accordance with [the Personnel Merit System]* after completing his working test period." V.I.Code. tit. 3, § 451 (1967) (emphasis added); *see* Majority Opinion *supra*, at 509. I can find no evidence in the record or in the statutory scheme that Atchley Richardson or any other member of the Police Auxiliary was appointed in accordance with the Personnel Merit System. In fact, I would be quite surprised to learn that auxiliary police were subjected to the rigors of the civil service system, such as appointment and promotion on the basis of competitive merit examinations, *see* V.I.Code Ann. tit. 3, § 521 (1967).[2]

In any case, Richardson has set forth no such proof. And with no proof that anyone in or out of government contemplated that an auxiliary policeman would be entitled to the benefits of the classified service, I cannot agree that Richardson had a protected property interest in his job.

I respectfully dissent.[3]

**2.** I find further support for this position in V.I. Code. Ann. tit. 23, § 1155 (Supp.1987), which declares that "[t]he selection of men for enlistment in the Police Auxiliary shall be made in an impartial manner and without discrimination against any person on account of creed, race, or color." Such a provision would have been wholly unnecessary if the selection of auxiliary policemen already was controlled by the merit appointment system of the classified service. Moreover, § 1155 itself makes no mention of

the need for competitive examinations; by negative implication, we can presume that auxiliary police are not subject to the rigors, or the rights, of the classified service.

**3.** Given the inconsistencies and ambiguities in the statutory scheme, the Virgin Islands legislature may be well advised to reexamine and clarify the employment rights and status of workers like Richardson.